**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Patrick E. WASHINGTON, Defendant–Appellant.**

**No. 91–3270.**

United States Court of Appeals, Tenth Circuit.

Nov. 15, 1993.

1512

Jenine M. Jensen, Asst. Federal Public Defender (Michael G. Katz, Federal Public Defender, with her on the brief), Denver, CO, for defendant-appellant.

Robert S. Streepy, Asst. U.S. Atty. (Jackie N. Williams, U.S. Atty., and Julie A. Robinson, Asst. U.S. Atty., on the brief), Kansas City, KS, for plaintiff-appellee.

Before LOGAN, FEINBERG,* and McWILLIAMS, Circuit Judges.

LOGAN, Circuit Judge.

Defendant Patrick E. Washington appeals three convictions for distribution of cocaine base in violation of 21 U.S.C. § 841(a)(1) and the sentence imposed upon him. He argues that (1) the district court improperly admitted into evidence the cocaine base allegedly obtained by the confidential informant (CI) because the chain of custody was inadequate, (2) the evidence was insufficient to establish defendant distributed cocaine, (3) the district court should have applied a clear and convincing standard of proof to the relevant conduct evidence utilized when sentencing defendant and the drug quantity figures were unreliable, (4) his presentence interview triggered both his Fifth Amendment privilege against self-incrimination and Sixth Amendment right to counsel, and (5) he was denied effective assistance of counsel at sentencing. We recite the evidence introduced in this case in detail because of its importance to the chain of custody and sufficiency of the evidence to convict issues.

I

In January 1991, FBI Special Agent Alan Jennerich contacted the Kansas City, Kansas, Police Department and requested assistance in locating an individual to cooperate in an FBI investigation of defendant for drug trafficking. Jennerich learned from his counterparts in Kansas City that Anthony Hunter recently had been arrested on state gun and drug charges, and for a probation violation. In interviews Jennerich concluded that defendant was Hunter's only drug supplier, and he enlisted Hunter to cooperate and serve as a CI making controlled buys from defendant.

Jennerich testified that he made no specific promises to Hunter in exchange for his role as the CI. Hunter also testified no promises were made, but that he hoped by cooperating his prison sentence for probation violation and the other charges would be shorter. Hunter did receive expense money, including funds for transportation away from Kansas City following defendant's arrest.

Hunter participated in controlled drug buys from defendant on February 5, 15 and 21, 1991. Each of these buys was the subject of a separate count in defendant's indictment.

* The Honorable Wilfred Feinberg, Senior United States Circuit Judge, United States Court of Appeals for the Second Circuit, sitting by designation.

A fourth attempted buy on February 7 consisted only of an exchange of money between the CI and defendant, although the FBI recorded an incriminating conversation.

Under ideal circumstances a controlled drug buy proceeds as follows. The CI and his vehicle are first searched for drugs and money and the CI is continuously surveilled until returning to the government location where, in recovering the contraband, he is searched again for drugs and money. These searches and surveillance procedures are intended to preclude the CI from attributing any contraband recovered by authorities to a source other than the object of the investigation.

The FBI was unable to conduct fully controlled buys on February 5 and 15 because Hunter necessarily spent some time at his residence before or after these buys and heavy traffic in the neighborhood precluded uninterrupted visual surveillance. The FBI evidently believed that defendant was wary of possible surveillance and conducted his sales spontaneously rather than at prearranged times and locations. Consequently, the agents did not search Hunter before the buys. During both transactions, however, Hunter was outfitted with a Nagra body recorder and a transmitter that operated continuously from the time he left the government location at a nearby motel with marked buy money until his return. This equipment was physically strapped to Hunter, including having the recorder switch secured with adhesive tape in the "on" position, so that he would be unable to tamper with the equipment without being detected. Hunter denied any attempt to tamper with the equipment.

On February 5, the FBI provided Hunter with $1200 in buy money. After he was equipped with recording and transmitting devices, Hunter took a taxi to his residence. Defendant then picked Hunter up and took him to defendant's residence nearby. The drug buy occurred in defendant's vehicle outside that residence. Within twenty minutes Hunter returned on foot. The FBI videotaped the portion of the transaction that occurred near Hunter's residence. Although the live surveillance did not specifically reveal defendant's presence in the car that transported Hunter to defendant's residence, the agent conducting the surveillance had previously interviewed defendant and recognized his voice. Hunter returned to the government location by taxi, where Agent Roland Corvington recovered a total net weight of 20.38 grams of cocaine base.

Hunter acknowledged that en route to the motel his cousin Tie Burks (who accompanied him in the taxi) sold $30 worth of cocaine through the window to obtain cash for the taxi fare. Hunter denied any other illegal activity while functioning as a CI, and the record revealed no unequivocal evidence to the contrary. Hunter acknowledged that while working as a CI he continued to collect money for drugs previously delivered to his buyers, and sold Vitablend, a form of fake cocaine.

For the February 15 buy, Hunter received $900 from the agents and traveled in his own vehicle from the motel after being equipped with a recorder and transmitter. Defendant was paged, and he and an individual named Landy picked Hunter up at his residence and went to defendant's residence. After the buy, defendant returned Hunter to his residence. Hunter went inside and then returned in his vehicle to the motel. The visual surveillance did not show that Hunter received drugs directly from defendant, but the conversation between Hunter and defendant included price negotiations and was consistent with Hunter's testimony that he had purchased cocaine base from defendant. The FBI recovered a total net weight of 20.64 grams of cocaine base from Hunter.

The FBI searched Hunter before the final controlled buy on February 21, and again equipped him with recording and transmitting devices. Hunter received $1200 in marked buy money; Agent Corvington accompanied him to his home. Hunter paged defendant repeatedly before being picked up in defendant's vehicle. The drug buy was completed on defendant's porch. Despite attempts at visual surveillance and video recording of the transaction, the FBI was unable to observe or record defendant physically handing cocaine base to Hunter. The audiotape, however, supported Hunter's tes-

timony that defendant sold cocaine base to him on that date.

Hunter walked home from this buy, and on the way he encountered Michelle Seawood. Hunter testified that he stopped to use the bathroom at "Ben's," a friend who lived "right around the corner at the back" of Hunter's residence. Supp. VII R. 200. Hunter evidently was denied permission and instead urinated in the backyard. Seawood testified that she observed Hunter obtain drugs from Ben, and that she then returned to Hunter's residence with him. Hunter denied that a drug transaction occurred at Ben's residence. He testified that he may have discussed selling car rims; the audiotape did contain some discussion of buying rims and wires. Agent Corvington met Hunter at his residence, deactivated the recorder, and returned to the motel with Hunter in the FBI vehicle. The agents recovered a net weight of 20.16 grams of cocaine base.

Pursuant to a search warrant, the FBI searched defendant's residence the following day and seized $9000 in cash, including $450 of the buy money from the previous day, an AK–47 assault rifle, and defendant's wallet containing some handwritten notes. Defendant subsequently was arrested, and convicted of the three counts of cocaine trafficking relating to the transactions on February 5, 15 and 21, 1991.

## II

 A district court ruling on the admission of real evidence is reviewed for abuse of discretion. *United States v. Cardenas,* 864 F.2d 1528, 1530 (10th Cir.), *cert. denied,* 491 U.S. 909, 109 S.Ct. 3197, 105 L.Ed.2d 705 (1989). We noted in *Cardenas* that cocaine "is not readily identifiable and is susceptible to alteration by tampering or contamination." *Id.* at 1531. The proponent of such evidence must lay a foundation establishing the "chain of custody" sufficient "to render it improbable that the original item has either been exchanged with another or been contaminated or tampered with." *Id.* (citation omitted). Flaws in the chain of

custody go to the weight of the evidence, but will not preclude admissibility.

 Hunter testified that he purchased cocaine base from defendant during each of the controlled buys for which defendant was convicted. The continuous audiotaping on each occasion supported his testimony. Nevertheless, during the course of each transaction, Hunter had at least one opportunity to tamper with the tape recorder or the contraband because of the absence of or breaks in visual surveillance. Agent Jennerich, who participated in outfitting and later removing the Nagra body recorder on all occasions, testified that the equipment was in good working order. He also testified that he did not believe Hunter had turned the recorder off or on, or otherwise "done anything to it" while wearing it.[1] Supp. VI R. 27–28. The cocaine recovered from each buy was of nearly identical purity and free of adulterants, supporting the conclusion the cocaine all came from the same source and was recovered by the FBI in the same condition as when it was purchased by Hunter. Hunter denied tampering with the cocaine purchased from defendant.

We hold that the district court did not abuse its discretion in admitting into evidence the cocaine base recovered from Hunter after each buy. The government established the improbability of defendant's argument that Hunter purchased Vitablend from defendant and surreptitiously substituted cocaine base for it, or otherwise mishandled his purchase (other than the illicit sale from the taxi after the February 5 buy). The record supports the conclusion that there was a reasonable probability that the cocaine base recovered had "not been altered in any material aspect." *United States v. Brewer,* 630 F.2d 795, 802 (10th Cir.1980).

## III

 Defendant next argues that the evidence that defendant sold cocaine base to Hunter on the dates in question was insufficient to convict. On appeal, we consider whether the evidence, when viewed in the light most favorable to the government, is

1. The jury listened to portions of the audiotapes.

sufficient for a reasonable jury to find defendant guilty beyond a reasonable doubt. *United States v. Hooks,* 780 F.2d 1526, 1531 (10th Cir.), *cert. denied,* 475 U.S. 1128, 106 S.Ct. 1657, 90 L.Ed.2d 199 (1986).

The evidence of cocaine base distribution consisted of Hunter's testimony, audiotapes of controlled buys from defendant, the FBI agents' foundation testimony and observations of these transactions, the recovered cocaine base, and cash (including marked money), defendant's wallet and handwritten notes found at defendant's residence.

Defendant testified he was a drug dealer for approximately four months before February 1991, during which time he became acquainted with Hunter. He stated that Hunter owed him money from that period, and that defendant sold him Vitablend on the dates in question in an effort to recover those debts. Defendant argues that after each buy Hunter procured the recovered cocaine base from another source, or that it was otherwise available to him. Defendant bolsters his position by focusing on the failure of the FBI to search Hunter before the February 5 and February 15 buys and the opportunities Hunter had for contact with unidentified third parties. Defendant emphasizes that Hunter's credibility is weak for a variety of reasons, including the admitted sale in his presence of cocaine base through the taxi window following the February 5 buy and Hunter's desire for leniency as a reward for his cooperation. Finally, Hunter acknowledged outstanding debts to defendant, which meshes with defendant's explanation for the transactions in question.

Despite some discrepancies in the testimony of the FBI agents and Hunter, and opportunities during each buy for Hunter to misappropriate the contraband, a reasonable jury could believe that defendant engaged in drug trafficking on the three dates listed in the indictment. The record evidence recited above contains sufficient evidence for a rational trier of fact to find the government established, beyond a reasonable doubt, each element of the offenses for which defendant was convicted. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

## IV

■ The remaining issues concern sentencing, as to which defendant makes constitutional and other arguments. He urges us to require that the drug quantities utilized as relevant conduct to establish his offense level be proven by clear and convincing evidence rather than by a mere preponderance of the evidence. Alternatively, he argues that the drug quantities used in the presentence report (PSR) were not established by a preponderance of the evidence. We review the district court findings of fact regarding drug quantities for clear error. *United States v. Padilla,* 947 F.2d 893, 896 (10th Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 2452, 124 L.Ed.2d 668 (1993).

### A

In calculating defendant's sentence, the PSR utilized a drug quantity of more than six kilograms, equating to a base offense level of 40, rather than the approximately sixty-one gram total involved in the three convictions, which would equate to a base offense level of 32. U.S.S.G. §§ 2D1.1(c)(2) and (6). This resulted in a sentence for each conviction of the statutory maximum term of forty years, running consecutively. The relevant conduct increased defendant's sentencing range from 210–262 months (taking into account upward adjustments for role in the offense and obstruction of justice) to life imprisonment (for the adjusted offense level of 44). Defendant argues that because the additional drug quantities effectively resulted in a life sentence a higher standard of proof should be required.

The PSR drug quantity figure was based on the following information. Defendant admitted in his presentence interview to selling one-half to one kilogram of cocaine base every three weeks for a twelve-week period ending in August of 1990. Probation Officer Sylvia Gruenbacher conservatively attached a total of 2.5 kilograms (2500 grams) to this period. Hunter informed the FBI on January 22, 1991, that defendant told him he received a kilogram of cocaine base that day. The following day Hunter informed the FBI

that since the summer of 1990 he had received forty-five ounces of cocaine base directly from defendant and an additional twenty ounces derivatively from defendant (a total of 1842.75 grams). Hunter informed the FBI on February 5 that during the two previous weeks he obtained six ounces (170.1 grams) of cocaine base from defendant and that defendant had received an additional kilogram of cocaine base on February 3. While Hunter also reported additional kilograms defendant anticipated receiving during February 1991, these amounts were not utilized in computing defendant's relevant conduct. The amounts for which defendant was actually convicted were deducted to avoid double counting.

▪ We note at the outset that defendant's sentence was enhanced by relevant conduct, but the district court did not make an upward departure beyond the guideline range. We recognize the strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof. *See* Becker, *Insuring Reliable Fact Finding in Guidelines Sentencing: Must the Guarantee of the Confrontation and Due Process Clauses Be Applied?*, 22 Capital U.L.Rev. 1 (1993). Here defendant's sentencing range went from approximately twenty years to consecutive forty year terms because the court took into account evidence of quantities of cocaine base for which defendant was not convicted. We have dictum in one case that hints at a higher standard for significant departures from the guidelines sentence, *United States v. St. Julian*, 922 F.2d 563, 569 n. 1 (10th Cir.1990) ("If the difference between the guideline sentence *and the departure sentence* is great," the court should consider the disparity in determining the appropriate standard of proof for sentencing facts) (citing *McMillan v. Pennsylvania*, 477 U.S. 79, 91–92, 106 S.Ct. 2411, 2418–19, 91 L.Ed.2d 67 (1986) and *United States v. Kikumura*, 918 F.2d 1084 (3d Cir.1990) (emphasis added)).

▪ Nevertheless, the Due Process Clause does not require sentencing facts in the ordinary case to be proved by more than a preponderance standard. *McMillan*, 477 U.S. at 84, 106 S.Ct. at 2415. We have clear holdings that the preponderance standard applies to fact finding in the sentencing process. *See United States v. Boyd*, 901 F.2d 842, 845 (10th Cir.1990), citing cases. We have upheld use of hearsay evidence from a CI as long as it has some indicia of reliability. *United States v. Reid*, 911 F.2d 1456, 1464 (10th Cir.1990), *cert. denied*, 498 U.S. 1097, 111 S.Ct. 990, 112 L.Ed.2d 1074 (1991); *see also United States v. Beaulieu*, 893 F.2d 1177, 1181 (10th Cir.), *cert. denied*, 497 U.S. 1038, 110 S.Ct. 3302, 111 L.Ed.2d 811 (1990). At least as concerns making guideline calculations the issue of a higher than a preponderance standard is foreclosed in this circuit.

The guidelines require that all relevant conduct be considered at sentencing. U.S.S.G. § 1B1.3. Drug quantities associated with illegal conduct for which a defendant was not convicted are to be accounted for in sentencing, if they are part of the same conduct for which the defendant was convicted. *United States v. Ross*, 920 F.2d 1530, 1538 (10th Cir.1990). The increase in defendant's sentence in the instant case is not a departure from the guidelines sentence. It is fundamentally a consequence of the adjusted offense level for his convictions, which are in the upper range. In the upper range, each additional point has a more significant effect on sentencing than adjustments in the lower range.

## B

▪ Alternatively, defendant asserts that the government did not prove the additional drug quantities by a preponderance of the evidence. The guidelines require aggregation of drug quantities for drug offenses which are "part of the same course of conduct or common scheme or plan as the offense of conviction". U.S.S.G. §§ 1B1.3(a)(2). The information upon which the district court relies must contain "sufficient indicia of reliability." *United States v. Easterling*, 921 F.2d 1073, 1077 (10th Cir. 1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2066, 114 L.Ed.2d 470 (1991); U.S.S.G. § 6A1.3(a).

The drug quantities contained in the PSR and accepted by the district court were con-

servative figures based upon defendant's own admissions at trial and in his presentence interview, and information gleaned by the FBI from Hunter. Defendant only challenged the drug amounts by questioning Hunter's credibility. Although Hunter's veracity was at issue, his statements to the FBI regarding defendant's sales volume are partially supported by defendant's own statements preserved on audiotape during the controlled buys. The sixty-five ounce estimate of crack cocaine Hunter reported to the FBI as having sold since the summer of 1990 is corroborated by defendant's audiotaped statements referencing prior transactions with Hunter. Hunter's February 5 report to the FBI about defendant receiving another kilogram of cocaine two days earlier is consistent with defendant's statements on the audiotape of February 5 of having "reupped" the "day before yesterday." Appellee's App. 4. The record contains uncontroverted testimony of long distance calls to Colombia, South America, made from defendant's residence. A document containing apparent notations of accounts receivable for drug sales was recovered with defendant's wallet pursuant to the search warrant executed at his residence. The district court's findings that these drug quantities were all part of the same course of conduct were not clearly erroneous. U.S.S.G. § 1B1.3(a)(2).

**C**

■ Defendant next argues that his presentence interview triggered both his Fifth Amendment privilege against self-incrimination and Sixth Amendment right to counsel. We review the underlying factual determinations under a clearly erroneous standard and the legal questions of the ultimate voluntariness of defendant's statements and whether the presentence interview was a critical stage of the proceedings de novo. *See United States v. Chalan,* 812 F.2d 1302, 1307–08 (10th Cir.1987), *cert. denied,* 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 565 (1988); *Esnault v. Colorado,* 980 F.2d 1335, 1336 (10th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1607, 123 L.Ed.2d 169 (1993) (Sixth Amendment right of accused to be present).

■ Routine presentence interviews generally do not require *Miranda* warnings, even if the defendant is in custody facing serious punishment. *United States v. Rogers,* 921 F.2d 975, 979 (10th Cir.), *cert. denied,* 498 U.S. 839, 111 S.Ct. 113, 112 L.Ed.2d 83 (1990). The record contains no evidence that the presentence interview was coercive or otherwise improper. Defendant chose to cooperate and did not invoke the privilege against self-incrimination. The information obtained was consistent with defendant's admissions at trial. Although the record does not reflect that the district court explained the presentence process to defendant, Probation Officer Gruenbacher gave uncontroverted testimony that she reviewed the process with defendant before the interview. Furthermore, the record reveals no evidence Gruenbacher acted other than as a neutral body assisting the district court. In the absence of some evidence the interview was handled in an adversarial fashion or that defense counsel intentionally was excluded from the process, we cannot hold that defendant's Fifth Amendment privilege was violated.

■ Defendant's Sixth Amendment argument also fails. We recently held that "the presentence interview is not a critical stage of the proceeding within the meaning of the Sixth Amendment." *United States v. Gordon,* 4 F.3d 1567 (10th Cir.1993). Therefore, defendant had no Sixth Amendment right to the presence or advice of counsel during his presentence interview. *Id.*

**V**

■ Finally, defendant asserts that he was denied effective assistance of counsel at sentencing.

The preferred avenue for challenging the effectiveness of defense counsel in a federal criminal trial is by collateral attack under 28 U.S.C. § 2255.... An accused will often not realize that he has a meritorious ineffectiveness claim until he begins collateral review proceedings, particularly if he retained trial counsel on direct appeal. Moreover, ineffectiveness claims frequently require consideration of evidence

not contained in the record on direct appeal.

*Beaulieu v. United States,* 930 F.2d 805, 806–07 (10th Cir.1991) (citations and quotations omitted). "[I]neffective assistance of counsel claims cannot be resolved on direct appeal when the claim has not been raised in the district court." *United States v. Kay,* 961 F.2d 1505, 1508 (10th Cir.1992). Defendant will have to assert such a claim, if he now believes he has one, by a collateral proceeding under 28 U.S.C. § 2255. .

AFFIRMED.