**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 13 2003**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

MARIO ESPINOZA, JR.,

      Defendant - Appellant.

No. 02-2250
(D.C. No. CR-01-310 BB)
(D. N.M.)

**ORDER AND JUDGMENT**[*]

Before **EBEL**, **HENRY**, and **HARTZ**, Circuit Judges.

A jury convicted Mario Espinoza, Jr., ("Espinoza") of distributing less than

5 grams of crack cocaine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C).

Although Espinoza's conviction was for a crime involving less than five grams of

cocaine, the district court found by a preponderance of the evidence that an

additional 278 grams of cocaine discovered at the residence where he was arrested

---

[*]After examining appellant's brief and the appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed. R. App. P. 34(a)(2) and 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This Order and Judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

should be attributed to him for sentencing purposes pursuant to U.S.S.G. § 1B1.3. Applying the sentencing guidelines, the district court determined that the aggregate amount of cocaine attributed to Espinoza resulted in a base offense level of 36, with a corresponding guideline range of 210 to 262 months. The court sentenced Espinoza to a prison term of 210 months.

On appeal, Espinoza makes two arguments challenging the district court's finding that the 278 grams of cocaine should be attributed to him. First, he argues that the district court should have used a clear and convincing evidence standard instead of a preponderance of the evidence standard when determining whether the additional cocaine should have been attributed to him. Second, he contends that even under a preponderance of the evidence standard, the 278 grams of cocaine should not have been attributed to him. We find these arguments to be unpersuasive and AFFIRM the sentence imposed by the district court.

**I**

This case involves Espinoza's sale of crack cocaine to an undercover police officer, and his presence, at the time of his arrest several months later, in an apartment where crack cocaine was being manufactured. The sale of crack occurred on December 8, 2000, when an officer of the Clovis, New Mexico police department went with a confidential informant to a trailer home in Clovis. (ROA

IV at 53–54.) Inside the trailer, the undercover officer purchased three rocks of crack cocaine from Espinoza. (Id. at 55–56, 62.)

Espinoza was arrested on January 31, 2001, at a townhouse in the Paseo Village complex in Clovis. While on his way to deliver an eviction notice that day, the Paseo Village property manager called the sheriff to report unusual activity at the townhouse. (ROA V at 232.) In response to the manager's complaint, Sheriff's Deputy Michael Reeves arrived at Paseo Village, knocked on the door of the townhouse in question, and Espinoza answered. (Id. 275, 279, 381–82.) When the door opened, Reeves could smell a strong odor of crack, (Id. at 277), and he suspected that crack was being manufactured inside. (Id. at 279.) Believing he had stumbled onto a drug location, Deputy Reeves radioed for assistance on his collar microphone. (Id. at 277.) While standing in the doorway and awaiting his backup, Reeves noticed a young black man sitting on a chair in the living room. (Id. at 278.) Deputy Reeves asked Espinoza if he and the other man were the only ones in the townhouse, and Espinoza said yes. (Id. at 279.)

Deputy Sheriff Lawrence Plotkin arrived soon after Reeves's call for assistance. (Id.) Deputy Plotkin interviewed Espinoza, while Deputy Reeves interviewed the man he had seen in the living room and who was later identified as Antonio Waites. (Id.; id. at 386–87.) Espinoza refused to give permission for

the deputies to search the house because, Espinoza claimed, it was not his house and he had no authority to do so. (Id. at 283–84, 382.)

As the deputies patted down Espinoza and Waites, they heard "some very loud crashing and banging" from the back of the house and suspected that people were fleeing the premises through a back window. (Id. at 285, 386.) Deputy Plotkin guarded Espinoza and Waites in the front yard while Deputy Reeves entered the house. (Id. at 286.) In his search of the house, Deputy Reeves discovered Mario Espinoza, Sr., the defendant's father, in a bedroom. (Id. at 287, 290, 387.) Reeves took Espinoza, Sr., to the front yard and returned to the house to wait for backup. (Id.) When backup arrived, Deputies Reeves and Plotkin searched the house for other people. (Id. at 290, 387.) They discovered a woman hiding in the master bathroom in the dark, and she was handcuffed and escorted out of the house. (Id. at 291–92.) Deputy Reeves noticed that one of the windows in the master bedroom had been opened and the screen pushed out. (Id. at 291.)

During the search, Reeves and Plotkin noticed suspicious items inside the open closet in the master bedroom. They saw two glass measuring cups, one with a white residue on it and the other containing a milky-colored liquid; a spoon; and a bag with white residue on one of the closet shelves. (Id. at 292–93, 387–88.)

They seized those items, and testing performed later determined that the white residue on the measuring cup was cocaine. (ROA VII at 642–43.)

An officer of the Clovis Police Department assisted in the search of the residence. (Id. at 462–65.) In the kitchen, he discovered a Pyrex bowl containing a substance he believed to be crack. (Id. at 392, 466.) The contents of the bowl subsequently tested positive for cocaine base, and the cocaine had a net weight of 271.7 grams. (Id. at 631–32.) He also found small amounts of crack cocaine in various parts of the kitchen, and in total 278 grams of cocaine base was recovered from the kitchen. (Presentence Report at 4, § 15.)

The next day, employees of a rental company came to the townhouse to collect furniture and appliances that had been rented by the occupants of the residence, and they found a package containing a white substance under one of the beds. (Id. at 499-500.) Deputy Plotkin took possession of the package, and subsequent testing revealed that it contained 471.5 grams of powder cocaine. (Id. at 402–04; ROA VII at 629–30.)

On March 31, 2001, a federal grand jury returned a two-count indictment against Espinoza and Waites. Count I charged them with conspiracy to possess with intent to distribute 50 grams or more of cocaine base, in violation of 21 U.S.C. § 846. Count II charged them with possession with intent to distribute 50 grams or more of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and

(b)(1)(A). (Doc. 1.) Waites pled guilty to that indictment. (Presentence Report at 3, ¶ 8.)

On September 26, 2001, a federal grand jury returned a three-count Second Superseding Indictment against Espinoza and two co-defendants, Clarence Kennedy and Rene Gonzales, who were alleged to have conspired with Espinoza to distribute crack. (Doc. 53.) Count I charged all three defendants with conspiracy to possess with intent to distribute 50 grams or more of cocaine base, in violation of 21 U.S.C. § 846, and Count III charged them with possession with intent to distribute 50 grams or more of cocaine base, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). (Id.) Count II charged Espinoza alone with distribution of less than 5 grams of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(c). (Id.)

At Espinoza's trial, Antonio Waites testified for the Government pursuant to a plea agreement. (ROA IV at 85–86.) He testified that in 1998 he met Espinoza's co-defendant, Clarence Kennedy. (Id. at 92.) In October 2000, Waites went to a trailer home in Clovis with Kennedy. There, he saw Espinoza selling crack that had been supplied by Espinoza's other co-defendant, Rene Gonzales. (Id. at 94–99.) One month later, Waites and Kennedy returned to the same trailer, and Waites again saw Espinoza dealing drugs. (Id. at 100-01.) In December 2000, Kennedy told Waites of a plan in which Gonzales would front

Kennedy kilogram quantities of cocaine and that Kennedy, Espinoza, and others would sell the cocaine in Clovis. (Id. at 104–05.)

Waites further testified that on January 31, 2001, Waites and Espinoza accompanied Kennedy as he drove around Clovis trying to collect money to repay a $23,000 debt that he owed to Gonzales. (Id. at 109–113.) Espinoza gave Kennedy some money to help pay the debt, (id. at 213), but when the three men met Gonzales that day at the Paseo Village townhouse, Kennedy had only collected $20,000. (Id. at 110.) Gonzales agreed to forgive the remaining $3000 if Kennedy would "cook up" crack for Gonzales worth that amount from some powder cocaine in the house. (Id.) After that conversation, Waites, Espinoza, and Kennedy drove to a Wal-Mart to purchase the supplies needed to make the crack, including a Pyrex bowl. (Id. at 111–12.)

According to Waites, after returning to the townhouse Kennedy began to cook the crack in the kitchen. (Id. at 114–18.) Shortly thereafter, there was a knock on the door and Espinoza answered it. (Id. at 118.) Waites overheard Espinoza talking to the property manager, who complained about the activity in the townhouse and delivered the eviction notice. (Id. at 118–19.) When Espinoza answered the door, Kennedy and Gonzales ran to the back room of the townhouse. (Id. at 119.) Only about two minutes after the property manager left, there was another knock on the door. (Id. at 119–20.) Espinoza again answered it, and this

time it was Deputy Reeves.  (Id. at 120.)  While the sheriff's deputies questioned Espinoza and Waites, Kennedy and Gonzales fled through the window in the master bedroom.  (Id. at 120–21.)  Then the deputies searched the house and discovered the drug paraphernalia.  (Id. at 121.)

On April 5, 2002, a jury found Espinoza guilty of Count II of the indictment.  (Doc. 125.)  The jury could not reach a verdict as to Espinoza on Counts I and III, and the district court declared a mistrial as to those counts. (Id.; Doc. 122.)  The jury convicted Kennedy of Counts I and II, and acquitted Gonzales of all charges.  (Id.)

In Espinoza's Presentence Report (PSR), the Probation Office attributed to Espinoza for sentencing purposes the 278 grams of cocaine found in the kitchen that formed the basis of Count III of the indictment.  (PSR at 5, ¶ 19.)  The PSR also attributed to Espinoza the 471 grams of powder cocaine found under the bed. (Id.)  Applying the sentencing guidelines to these amounts generated a base offense level for Espinoza of 34.  The Probation Office determined that Espinoza's criminal history category was II.  (Id.)

Both the Government and Espinoza filed objections to the PSR.  The Government objected to the PSR because it did not contain an upward adjustment

under U.S.S.G. § 3C1.1 for Espinoza's false testimony at trial.[1]  Espinoza filed an objection challenging the attribution to him of the 278 grams of cocaine base and 471 grams of powder cocaine.  (Doc. 146.)  In a Second Addendum to the PSR, the Probation Office agreed with the Government's request for an upward adjustment for false testimony and rejected Espinoza's objection.  (Second Add. to PSR.)  The Probation Office therefore added two levels for obstruction of justice, resulting in a total offense level of 36 for Espinoza.  With his criminal history category of II, this generated a guideline sentencing range of 210 to 262 months imprisonment.

At the sentencing hearing on August 19, 2002, the district court concluded that it would not attribute the 471 grams of powder cocaine to Espinoza.  (ROA III at 17.)  It doubted that a preponderance of the evidence established that the powder cocaine was attributable to Espinoza, (id. at 14–15), and it concluded that whether or not the powder cocaine was included in the quantity of drugs used to calculate Espinoza's sentencing range would not affect that calculation.[2]

---

[1]The Government argued this upward adjustment to the total offense level was appropriate because Espinoza testified at trial that he did not sell crack cocaine to the undercover police officer, but the jury convicted of him of having done so.  (Doc. 137.)

[2]Pursuant to U.S.S.G. § 2D1.1 cmt. n.9 (2001), the Drug Equivalency Table provides a means for converting different controlled substances (e.g., powder cocaine and cocaine base ("crack")) into an equivalent amount of marijuana.  By adding the total marijuana equivalents, a single offense level is obtained in the

(continued...)

However, the district court did find that the 278 grams of cocaine base was properly attributed to Espinoza. The court stated, "I certainly think by a preponderance of the evidence there is adequate evidence to link him to the remainder of the narcotics used as a basis for calculation." Tr. of Sentencing Hr'g at 15–16. Espinoza did not object to the district court's use of a preponderance of the evidence standard for making this determination, nor did Espinoza argue that a higher standard should be used. After adopting the factual findings in the PSR and its application of the guidelines, the district court sentenced Espinoza to 210 months imprisonment, the low end of the applicable range. (Id. at 16–17.) Judgment was entered on September 4, 2002, and Espinoza timely filed a notice of appeal.

## II

On appeal, Espinoza's first contention is that the district court should not have used a preponderance of the evidence standard to determine what drug

---

[2](...continued)
Drug Quantity Table at U.S.S.G. § 2D1.1(c)(3). In the instant case, the 471 grams of powder cocaine converts into 94.2 kilograms of marijuana, and the 278 grams of cocaine base converts into 5,980 kilograms of marijuana. The combined converted total of 6,074 kilograms of marijuana generates a base offense level of 34 in the Drug Quantity Table. U.S.S.G. § 2D1.1(c)(3) (stating a base offense level of 34 for "[a]t least 3,000 KG but less than 10,000 KG of Marihuana."). Removing the 94.2 kilograms of marijuana equivalent for the 471 grams of powder cocaine does not remove the aggregate drug quantity from the range of 3,000 kilograms to 10,000 kilograms of marijuana that generates an offense level of 34.

quantities, in addition to those for which he was convicted, should be considered in calculating his sentence. The sentencing guidelines for Espinoza's crime require the court to calculate the amount of drugs involved when setting the base offense level. See U.S.S.G. § 2D1.1(a)(3), (c). The district court found by a preponderance of the evidence that the 278 grams of cocaine base discovered in the Paseo Village townhouse should be attributed to Espinoza in addition to the less than 5 grams of cocaine base he was convicted of selling under Count II of the Second Superseding Indictment. Espinoza argues that because the drug quantities attributed to him so dramatically increased the applicable sentencing range, the district court should have applied a clear and convincing evidence standard when determining the quantities attributable to him.[3] (Aplt. B. at 17–18, 22.)

Ordinarily, we review the sentencing court's application of the guidelines de novo and its fact findings under the clearly erroneous standard. United States v. Melton, 131 F.3d 1400, 1403 (10th Cir. 1997). Espinoza, however, did not object to the burden of proof employed by the district court at sentencing, a fact that he admits in his Reply Brief. (R.B. at 1.) Consequently, we only review this

---

[3]If Espinoza had only been sentenced for the 1 gram of crack he sold to the undercover officer, his base offense level would have been 18 and the applicable sentencing range would have been 30–37 months. See U.S.S.G. § 2D1.1 cmt. n.9 (Drug Equivalency Table); id. § 2D1.1(c)(3) (Drug Quantity Table).

issue for plain error.  United States v. Olano, 507 U.S. 725, 731–32 (1993).  For Espinoza to prevail under the plain error standard of review, he must show that there is (1) error, (2) that is plain, (3) that affects "substantial rights," and (4) that the error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings."  Id. at 732–36 (alteration in original) (internal quotation marks omitted).

As to the first part of the plain error standard—whether there was error at all—Espinoza first concedes that our cases have firmly established that ordinarily the district court need apply nothing more than a preponderance of the evidence burden of proof when determining relevant conduct for sentencing purposes.  See United States v. Washington, 11 F.3d 1510, 1516 (10th Cir. 1993); United States v. Mendez-Zamora, 296 F.3d 1013, 1020 (10th Cir. 2002); (Aplt. B. at 19–21).  He argues, however, that our cases leave open the possibility that a higher burden of proof should be applied when the relevant conduct at issue results in a dramatic increase in sentence.  See, e.g., Washington, 11 F.3d at 1516 ("[T]he Due Process Clause does not require sentencing facts *in the ordinary case* to be proved by more than a preponderance standard.") (emphasis added); Mendez-Zamora, 296 F.3d at 1020 (holding that because the defendant's increase in sentence was less than the increase at issue in Washington, the preponderance of the evidence standard should apply and thus apparently leaving open the possibility that a more

dramatic increase in sentence might warrant a heavier burden of proof).

Specifically, Espinoza argues that the sentence enhancements at issue in this case are far greater than those at issue in Washington and Mendez-Zamora, putting his case in the supposed special category of "dramatic enhancement" cases requiring a clear and convincing evidence standard. We put off for another day the question whether there are some cases in which the increase in sentencing range resulting from relevant conduct attributed to the defendant is so great that proof by clear and convincing evidence is required. We need not address that question here because, even if we concluded that there were such a class of cases, and that this case might be one of them, Espinoza would fail to satisfy the other parts of the plain error standard of review.

First, even if we were to agree with Espinoza that it was error for the district court to use the preponderance of the evidence standard, it would not be a "plain error." "'Plain' is synonymous with 'clear' or, equivalently, 'obvious.'" Olano, 507 U.S. at 734. For us to agree with Espinoza's argument and conclude that the clear and convincing evidence standard applies, we would have to qualify the statements in our case law to the contrary. See, e.g., Washington, 11 F.3d at 1516 ("At least as concerns making guideline calculations the issue of a higher than a preponderance standard is foreclosed in this circuit."). We would have to establish a new legal principle in our Circuit in order to find that error occurred in

this case, and in that circumstance the error could not be said to be "clear" or "obvious."

Second, for an error to affect substantial rights, "[i]t must have affected the outcome of the district court proceedings," and "the defendant rather than the Government . . . bears the burden of persuasion with respect to prejudice." Olano, 507 U.S. at 734. There is no question that the 278 grams of crack cocaine attributed to Espinoza by the district court significantly increased the sentencing range he faced. But the burden is on Espinoza to persuade us that the 278 grams of crack would not have been attributed to him if the clear and convincing evidence standard had been applied. He does not attempt to make this showing. In fact, even after the Government's brief put him on notice that the plain error standard of review applied to this issue and he conceded the point, he made no attempt in his Reply Brief to show us how the clear and convincing standard would have changed the outcome of his sentencing.

Third, we only exercise our discretion to consider plain errors if the error is one that "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." Id. at 732–36 (alteration in original) (internal quotation marks omitted). That standard is not met here. As just stated, for Espinoza to prevail, we would have to, for the first time in our Circuit, qualify the existing rules about what burden of proof applies to a district court's determination of what acts

should be attributed to a defendant for sentencing purposes. It is not an error that seriously affects the fairness, integrity, or public reputation of judicial proceedings for a district court judge to fail to anticipate that we would agree to such a modification of the existing law, particularly when the possibility of the modification was not raised with the district court by Espinoza.

In his Reply Brief, Espinoza argues that we should not apply the plain error standard of review to this issue even as he concedes that this standard is the one normally applied in cases, like his, where the appellant failed to raise the issue below. He contends that it is "fundamentally unfair" to apply the plain error standard of review in cases where the defendant has "no reasonable ability or opportunity to make [an objection]." (R.B. at 2.) Espinoza, however, cites no authority for such a rule, and even were this rule embraced by the case law, it would not help him here. We do not agree with Espinoza's claim that "the considerations, inherent to a judge's application of burdens of proof at a sentencing hearing, eliminate or substantially reduce a defendant's ability to voice a meaningful objection." (Id.) The district court judge stated at the sentencing hearing that he was applying a preponderance of the evidence standard to make his determination of relevant drug quantities should be attributable to Espinoza. Tr. of Sentencing Hr'g at 15–16 ("THE COURT: I certainly think by a preponderance of the evidence there is adequate evidence to link him to the

remainder of the narcotics used [i.e., the 278 grams of crack] as a basis for calculation."). Espinoza's counsel was present and could have objected to the district court's application of the preponderance of the evidence standard.

Moreover, it was not unexpected that the issue of what relevant conduct should be attributed to Espinoza, and accordingly what burden of proof must be met to find such conduct, would arise at the sentencing hearing. Espinoza objected to the PSR's treatment of this issue and his counsel was prepared to argue it again at the hearing. His counsel should have been familiar with the evidentiary standard applied to determinations of what drug quantities are attributable to a defendant and been prepared to argue for his position, which we have explained would be a qualification to the usual application of the preponderance of the evidence standard. We are, therefore, unpersuaded by Espinoza's argument that we should employ de novo, instead of plain error, review for this issue.

Employing the plain error standard of review, we conclude that the district court properly applied the preponderance of the evidence burden of proof at the sentencing hearing.

### III

Espinoza's second argument on appeal is that even if using the preponderance of the evidence standard was correct, the district court erred in

attributing the 278 grams of cocaine base found in the kitchen of the townhouse to him for sentencing purposes because a preponderance of the evidence did not support that finding. We review the factual findings supporting the district court's base offense level calculations under the clearly erroneous standard, United States v. Wise, 990 F.2d 1545, 1550 (10th Cir. 1992), and we conclude that the district court's findings were not clearly erroneous.

The sentencing guideline applicable to Espinoza's conviction under 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) is U.S.S.G. § 2D1.1(a)(3). It includes a range of base offense levels, and which one applies in a given case is determined by the quantity of drugs involved. In calculating the quantity of drugs involved, the guideline states that the sentencing court should include all relevant quantities of drugs, including "quantities of drugs not specified in the count of conviction." U.S.S.G. § 2D1.1, cmt. n.12 ("Types and quantities of drugs not specified in the count of conviction may be considered in determining the offense level. See § 1B1.3(a)(2) (Relevant conduct)."). In order for quantities of drugs to be relevant, and therefore attributable to a defendant for sentencing purposes under U.S.S.G. § 1B1.3(a)(2), three prerequisites must be met:

> First, there must be a finding that the offense in question involved conduct described in §§ 1B1.3(a)(1)(A) and (B) [of the guidelines]. Second, the offense must be the type of offense that, if the defendant had been convicted of both offenses, would require grouping with the offense of conviction for sentencing purposes under U.S.S.G. § 3D1.2(d). Third, the offense must have been "part of the same

course of conduct of common scheme or plan." U.S.S.G. § 1B1.3(a)(2).

United States v. Taylor, 97 F.3d 1360, 1363 (10th Cir. 1996). Espinoza does not dispute that the second requirement for attributing the 278 grams of cocaine base to him is met. His argument is that the record does not support, by a preponderance of the evidence, that he aided or abetted the manufacture of the crack cocaine in the kitchen of the townhouse, as required by U.S.S.G. § 1B1.3(a)(1)(A) and (B), or that the manufacture of that cocaine was part of a common scheme or plan with Kennedy and Gonzales, as required by U.S.S.G. § 1B1.3(a)(2).

A preponderance of the evidence supports the findings that Espinoza aided and abetted the crack manufacturing and that the crack manufacturing was part of a common scheme or plan. Espinoza actively attempted to conceal the crack manufacturing operation from the police by lying to Officer Reeves when Reeves asked him if anyone else was in the house besides Waites. Espinoza lied by saying only he and Waites were there even as Gonzales and Kennedy escaped through a back window and two other people remained hiding in the house. This fact established that Espinoza aided and abetted Kennedy's preparation of the crack.

Furthermore, the record supports a finding that a preponderance of the evidence established that Kennedy's preparation of crack was part of a common

- 18 -

scheme or plan with Espinoza to distribute crack cocaine. Waites testified that on two occasions he traveled with Kennedy to a trailer home where he witnessed Espinoza selling crack provided by Gonzales. Shortly thereafter, Kennedy told Waites that he and Espinoza had moved from the trailer into a house and that Gonzales was going to front them kilogram quantities of cocaine that Kennedy, Espinoza, and others would sell in Clovis. (ROA IV at 103–05.) Waites also testified that Espinoza contributed cash to Kennedy to pay a debt owed to Gonzales, and was present when cocaine was being cooked into crack for use in repaying the remainder of the debt to Gonzales. Because there is factual support for the district court's finding in the record, and we have no definite or firm conviction that a mistake has been made, we conclude that the district court did not commit clear error when it found that the 278 grams of cocaine Kennedy was making into crack was part of a common plan or scheme involving the crack that Espinoza sold to an undercover police officer. Manning v. United States, 146 F.3d 808, 812 (10th Cir. 1998) (clear error standard met when a finding is "without factual support in the record or if [we are] . . . left with a definite and firm conviction that a mistake has been made.).

Espinoza challenges this conclusion by pointing out that the district court did not attribute the 471 grams of powder cocaine to him. He argues that because the evidence establishing Espinoza's connection to the 278 grams of crack was

similar to the evidence linking him to the powder cocaine, and the district court's refusal to attribute the powder cocaine suggests there was not a preponderance of the evidence to support attribution of that cocaine, then there also was not a preponderance of the evidence supporting attribution of the crack cocaine. (Aplt. B. at 27–28.) We find this argument unpersuasive for at least two reasons. First, one of the reasons for why the district court did not attribute the powder cocaine to Espinoza was that attributing that quantity of cocaine would not have affected Espinoza's offense level. Tr. of Sentencing Hr'g at 15 ("It doesn't make any difference whether that kilo in the mattress was charged to [Espinoza]. The sentence guideline range remains the same."); see supra, at n.2. The powder cocaine was irrelevant in terms of sentencing. Second, the district court's refusal to attribute the powder cocaine to Espinoza, whether right or wrong, says nothing about whether it was clear error to attribute the 278 grams of crack cocaine to him. As we stated above, there is evidence in the record to support that conclusion, and we have no definite and firm conviction that it was a mistake by the district court to attribute the crack to Espinoza. The district court's treatment of the powder cocaine does not affect this analysis.

For foregoing reasons, we conclude that the district court properly attributed 278 grams of crack cocaine to Espinoza for sentencing purposes.

**IV**

Because the district court selected the correct evidentiary standard for assessing attributable drug quantities at the sentencing hearing and correctly applied that standard, we AFFIRM the sentence imposed by the district court.

ENTERED FOR THE COURT


David M. Ebel
Circuit Judge