FILED
United States Court of Appeals
Tenth Circuit

March 11, 2008

Elisabeth A. Shumaker
Clerk of Court

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

TIMMY BRENT OLSEN,

      Defendant-Appellant.

No. 06-4307

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:06-CR-312-JTG)**

Jeremy M. Delicino (Stephen R. McCaughey, with him on the briefs), Salt Lake
City, Utah, for the Defendant-Appellant.

Diana Hagen, Assistant United States Attorney (Brett L. Tolman, United States
Attorney, with her on the brief), Salt Lake City, Utah, for the Plaintiff-Appellee.

Before **BRISCOE**, **SEYMOUR**, and **LUCERO**, Circuit Judges.

**LUCERO**, Circuit Judge.

Timmy Brent Olsen appeals his conviction and sentence on fifteen counts

of perjury in violation of 18 U.S.C. § 1623(a). He contends that the district court

abused its discretion by declining to sever three of the perjury counts, and that it violated his due process rights by finding a sentencing fact by only a preponderance of the evidence. We disagree. We do not discern an abuse of discretion in refusing to sever the counts, and any constitutional error is harmless beyond a reasonable doubt. We therefore **AFFIRM** Olsen's conviction and sentence.

**I**

**A**

Olsen's perjury conviction arises from a federal grand jury's investigation into the 1995 disappearance of Kiplyn Davis, a 15-year-old high school student from Spanish Fork, Utah, last seen on May 2, 1995. After learning that Davis had not attended her afternoon classes that day, her parents began a frantic search to locate her. Despite the subsequent efforts of the local police and the FBI, Davis has not yet been found. Statements by various witnesses and potential suspects, however, suggest that Davis may have disappeared in the area near Spanish Fork Canyon.

During the months following Davis' disappearance, the FBI interviewed Olsen on six different occasions. In these interviews, Olsen gave differing statements regarding when he had last seen Davis—on the day of her disappearance, or two months prior. Olsen also provided agents with two inconsistent alibis, first claiming that he had spent May 2, 1995, installing

sprinklers at a local reception center, but later stating that he had been shingling a shed with a friend, Scott Brunson. Brunson later corroborated the second alibi, and the police never charged Olsen with a crime during the initial investigation.

In the years following Davis' disappearance, the investigation hit what her father, Robert Davis, described as a "dead end." In 2003, however, Robert Davis learned that the government had convened a federal grand jury to investigate the high-profile disappearance of another Utah teenager, Elizabeth Smart. After Robert Davis wrote a letter to the United States Attorney for the District of Utah, the government agreed to open a grand jury investigation into Davis' case as well. The grand jury ultimately heard testimony from a substantial number of witnesses, including over twenty who would later testify at Olsen's federal perjury trial. Among the grand jury witnesses was Olsen himself, who was questioned extensively about statements he had made to friends, acquaintances, and law enforcement officials regarding Davis and the events of May 2, 1995.

Following his testimony before the grand jury, Olsen was indicted on September 22, 2005, on sixteen counts of perjury in violation of 18 U.S.C. § 1623(a). Although the trial court later dismissed one count as duplicative, the remaining fifteen counts alleged that Olsen had lied during his grand jury testimony. We briefly summarize these counts and the testimony presented by the government on each.

Counts One through Five charge Olsen with denying to the grand jury that he had previously made various statements regarding Davis' disappearance. Count One arose from Olsen's explanation to the grand jury of certain statements he made to an FBI polygraph examiner during the initial investigation. In October 1996, Olsen agreed to submit to a polygraph examination administered by FBI Agent Ronald Homer. At trial, Homer testified that during a pretest interview,[1] Olsen initially stated that he had no recollection of the events occurring on the afternoon of May 2, 1995. After Homer encouraged Olsen to be completely forthcoming, however, Olsen recounted that he had driven to Spanish Fork Canyon that day, where he saw a Ford Ranger that belonged to "Rucker" and then saw Rucker with Kiplyn Davis.

> At Homer's request, Olsen wrote down his recollection that
>
> [o]n May 2nd, 1995 I (Tim Olsen) saw Kiplyn [Davis] and Rucker up Spanish Fork Canyon in Rucker's Ranger, and I know it was Rucker. I followed Rucker out of the canyon and down Center Street. I remember Rucker and Kiplyn talking because I was there.

Olsen told Homer that after he saw Rucker and Davis talking, both walked away but only Rucker returned, at which point Rucker told Olsen not to worry about where Davis went. Homer testified at trial that he did not tell Olsen what to

---

[1] According to Homer, he conducted a pretest interview in order to answer Olsen's questions about the polygraph procedure and to elicit a consistent story, which would increase the accuracy of the test. Although pretest interviews normally last around 45 minutes, Olsen's continued for roughly five hours. Following the pretest interview, Olsen terminated the session with Homer and declined to submit to the actual polygraph test.

write, and lacked the familiarity with Spanish Fork evident in Olsen's written statement. By contrast, Olsen testified to the grand jury that Homer tried to "put stuff in [his] head" and that Homer told him specifically what to write. Count One charges that this statement was untrue.

Count Two also involved Olsen's pretest account to Homer. Before the grand jury, Olsen stated that he had never told the story he wrote down for Homer to anyone other than law enforcement. At Olsen's perjury trial, the government presented three civilian witnesses, each of whom recalled Olsen telling them a story similar to what Olsen later recounted to Homer.

Olsen's sister, Corri Olsen Hanks, testified that Olsen spoke to her after the interview with Homer. Olsen told Hanks that he had written down "exactly what happened": he saw Rucker and Davis at the canyon, and both walked over a hill but only Rucker returned. Robert Gilner, who worked with Olsen in July 1995, testified that Olsen told him and other coworkers that Rucker and Davis were together in Spanish Fork Canyon on the day of Davis' disappearance. According to Gilner, Olsen also told him that "Rucker had pulled out a flashlight and beat [Davis] over the head and buried her in a blanket." Finally, Shauna Mansfield testified that she confronted Olsen about Davis' disappearance in mid-1996. Olsen responded by telling Mansfield that he and Rucker took Davis to Spanish Fork Canyon, and Rucker took her away while Olsen remained in the truck.

Rucker then came back to the truck for a flashlight, disappeared again, and later returned to tell Olsen, "I did her in. I hurt her."

Count Three alleged that Olsen perjured himself when he denied vomiting in Heath Robinson's car at a party in 1998. It also contended that Olsen perjured himself when he denied having told people at that same party that he saw a man and a woman leave his campsite at Spanish Fork Canyon on the day Davis disappeared, but only saw the man return. At trial, Robinson testified that Olsen indeed vomited in his car. Another attendee, Kevin Johnson, testified that he heard a "very emotional" Olsen say: "I didn't get out. I stayed in the truck. They was gone for a while. He came back, got in the truck and sped down the canyon."

In Count Four, the indictment charged that Olsen lied when he told the grand jury that he last saw Davis two to three months before she disappeared. Three witnesses testified at trial that Olsen told them he and Davis skipped school together on the afternoon of her disappearance. Olsen further told one of these witnesses that he had gone up to the mountains with Davis, engaged in an argument with her, and then "took care of her."

Count Five alleged that Olsen committed perjury before the grand jury when he stated that he "absolutely" never asked Brunson to provide him with a false alibi for the day of Davis' disappearance. Brunson testified to the contrary at trial, stating that Olsen "asked [him] for an alibi." Although he initially

refused Olsen's request, Brunson eventually told FBI agents that he and Olsen spent the day building a shed together on May 2, 1995.[2]

Counts Six through Nine charged Olsen with repeatedly perjuring himself when asked about his history of sexual violence. Count Six stated that Olsen committed perjury when he told the grand jury that he had never committed rape or forced a woman to have sex with him against her will. During Olsen's trial, the government presented testimony from two women, both of whom recounted that Olsen had raped them. In addition, three other witnesses gave testimony recalling, with varying degrees of specificity, that Olsen told them he had raped Davis.

Count Seven alleged that Olsen lied before the grand jury when he denied assaulting and raping Amber Payne, a former girlfriend, after she asked him about his role in Davis' disappearance. Payne also testified at Olsen's trial. She told the jury that after she asked Olsen about Davis, he hit her in the stomach, threw her against a wall, and took her to Spanish Fork Canyon, where he raped her.

Count Eight charged Olsen with perjuring himself by telling the grand jury that he never became sexually aggressive with a woman in Oak City Canyon and never hit her over the head with a flashlight. Olsen told the grand jury that the government's question about this incident was "the most absurd thing [he'd] ever

---

[2] Brunson later pleaded guilty to perjury and making false statements to an FBI agent.

heard in [his] entire life." At trial, however, the government called a witness who testified that Olsen had indeed tried to kiss her and that when she refused, he then hit her over the head with a flashlight. The witness further stated that the hit "was like a reflex [for Olsen]. It was just instantly."

Count Nine alleged that Olsen committed perjury when he denied "get[ting] violent" with his two ex-wives, specifically denying that he had pushed Brandi Olsen ("Brandi"), one of his ex-wives, up against a wall. Brandi testified at trial that approximately two weeks after she and Olsen married, he accused her of cheating on him. He then threw her down to the ground, grabbed her wrists, and pinned her there, making it difficult for her to breathe. Brandi also recounted a subsequent incident where, after she told Olsen that she wanted a divorce, he slammed her against a wall hard enough to knock down a picture which landed on her head.

Counts Ten through Fourteen charged Olsen with perjury based on his disavowals when asked in the grand jury proceeding whether he had made a series of statements claiming that he killed Davis. Count Ten declared that Olsen lied to the grand jury when he denied that, after playing football with some friends, he said about Davis: "I know that fucking bitch, I killed her." The government called two witnesses, both present at a party following a football game in the summer of 1999, to testify that Olsen had indeed made the statement. One witness recounted Olsen's statement as "I know where that fucking bitch is, I

killed her," and the other testified that Olsen said, "I know where she is at, I killed her."

In Count Eleven, the indictment stated that Olsen committed perjury when he denied telling Shawn Pierce that he had killed Davis. At trial, Pierce testified that during a party, Olsen told him that he "took [Davis], beat her, killed her and disposed of her body."

Count Twelve charged Olsen with perjury for telling the grand jury that he never told Chris Butterfield, or anyone else, that the FBI was after him because he had killed someone. Butterfield testified at trial, telling the jury that Olsen indeed made such statements, including that "I did it, I did it, I killed her, I raped her." In addition, a number of other witnesses for the government testified to hearing Olsen say that he had killed Davis.

Count Thirteen stated that Olsen lied when he denied to the grand jury that he told a group of people that "we all know who did it" and "we all did it," in reference to Davis' disappearance. At trial, a government witness testified that Olsen said exactly that during a party in February 1999.

Count Fourteen charged perjury in relation to Olsen's statement to the grand jury that he never told anyone that he had buried Davis in the sand. During Olsen's trial, the government presented testimony from Don Meadows, who employed Olsen during the early half of 2002. Meadows testified that one day while he and Olsen were framing a house, he asked Olsen, "what did you do with

her," without specifically naming Davis. Olsen replied that he "wished he knew so he could tell her parents what happened to her." Meadows then asked the same question again, and this time Olsen stated that "we buried her in the sand," adding that "bodies sink in the sand."

Finally, Count Fifteen of the indictment alleged that Olsen lied when, in his grand jury testimony, he denied telling anyone that he had "any information or [was] in any way involved with Kiplyn Davis's disappearance or death or burial." The government presented testimony from a number of witnesses, in addition to those testifying in relation to other counts of the indictment, who remembered Olsen telling various stories about his role either participating in, or witnessing, Davis' disappearance and death.

**B**

Prior to trial, Olsen moved to sever three counts of the indictment from the remaining twelve counts.[3] He contended that these counts involved issues unrelated to the Davis investigation and that including them would prejudice his ability to receive a fair trial on any of the fifteen counts. After the court denied Olsen's motion, the case proceeded to trial, and the jury found Olsen guilty on all fifteen counts.

Following his conviction, Olsen's Presentence Report ("PSR") recommended applying a United States Sentencing Guideline ("Guideline") cross

---

[3] Olsen sought to sever Counts Six, Eight, and Nine.

reference that would significantly increase Olsen's advisory sentencing range.

Normally, the Guidelines dictate a base offense level of 14 for perjury. U.S.S.G.

§ 2J1.3(a). For an individual such as Olsen with a criminal history category of II,

this would result in an advisory Guidelines range of 18 to 24 months'

imprisonment. Id. Ch 5, Pt. A. When perjury occurs "in respect to a criminal

offense," however, the offense level must be computed by reference to § 2X3.1

("the cross reference"), the guideline for a conviction of being an "Accessory

After the Fact." § 2J1.3(c)(1).

Under the cross reference, the offense level calculation is tied to the

offense level of the crime underlying the perjury. Once the district court

determines the nature of the underlying offense, § 2X3.1 sets the base offense

level for perjury at six levels below that of the underlying offense, but with a

maximum level of 30. § 2X3.1(a). Olsen's PSR noted an underlying offense of

second-degree murder, which carries a base offense level of 38, see § 2A1.2, and

set Olsen's total adjusted offense level at 30 in accordance with § 2X3.1(a)(3)(A).

Taking that offense level together with Olsen's criminal history category of II, the

PSR recommended a Guidelines sentencing range of 108 to 135 months.

Olsen filed timely objections to the PSR, taking issue with the application

of the cross reference based on an underlying offense of second-degree murder.

He first argued that the government had not demonstrated by a preponderance of

the evidence that he "committed, or was a party to, a homicide." He also

contended that the preponderance of the evidence standard applicable to the Guidelines calculation failed to afford him with adequate due process, and moved for a heightened standard of proof. Finally, in a separate motion, he requested an evidentiary hearing to determine whether the cross reference should apply.

The district court denied Olsen's motions for an evidentiary hearing and for application of a heightened evidentiary standard. On the motion for a heightened standard of proof, the court concluded that the preponderance of the evidence standard governs all matters involving Guidelines calculations. Observing "a great abundance of evidence" on the issue of whether the cross reference applied, it also denied Olsen's motion for an evidentiary hearing, and found that the grand jury's investigation related to the kidnapping and murder of Kiplyn Davis.[4] It thus concluded, by a preponderance of the evidence, that Olsen's perjury was committed in respect to the crime of second-degree murder and adopted the findings within the PSR.

Finding that no other adjustments applied, the district court calculated an advisory Guidelines range of 108 to 135 months. See U.S.S.G. Ch 5, Pt. A. It ultimately varied upward, under the sentencing considerations set forth in 18

_____

[4] The court also denied the government's requests for enhancements beyond those recommended in the PSR, and rejected its request for a sentence of 405 months' imprisonment.

U.S.C. § 3553(a), to impose a total sentence of 150 months' imprisonment.[5]

Olsen now appeals his conviction and sentence, urging that the district court abused its discretion in denying his motion to sever Counts Six, Eight, and Nine, and that the court erred in applying a preponderance of the evidence standard to the sentencing cross reference. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II

We first address Olsen's motion to sever. He contends that the trial court should have severed: (1) Count Six, regarding his statement that he never forced a woman to have sex with him; (2) Count Eight, relating to his statement that he never hit a woman over the head with a flashlight; and (3) Count Nine, alleging that he lied when he denied assaulting his ex-wives. We disagree.

Federal Rule of Criminal Procedure 8(a) allows offenses to be joined together for a single trial when those offenses "are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." On appeal, Olsen does not contend that the counts were improperly joined

---

[5] The court reached the 150 month sentence as follows: (1) 60 months on Counts One through Five, to run concurrently to one another and consecutively to the other counts; (2) 30 months on Counts Six through Nine, to run concurrently to one another and consecutively to the other counts; and (3) 60 months on Counts Ten through Fifteen, to run concurrently to one another and consecutively to the other counts.

under Rule 8, as all fifteen counts of perjury arose from a single transaction: Olsen's grand jury testimony on April 28, 2005.

Even if the requirements of Rule 8(a) are met, however, Federal Rule of Criminal Procedure 14(a) permits a trial court to conduct separate trials if the joinder of separate offenses "appears to prejudice a defendant or the government." We have long recognized that the decision "to grant severance under Rule 14 rests within the discretion of the district court and the burden on [the] defendant to show an abuse of discretion in this context is a difficult one." United States v. Johnson, 130 F.3d 1420, 1427 (10th Cir. 1997) (quotation omitted). To make this showing of prejudice, the defendant must demonstrate that his "right to a fair trial is threatened or actually deprived." Id. at 1427; see also United States v. Valentine, 706 F.2d 282, 290 (10th Cir. 1983).

On appeal, Olsen avers that he was prejudiced because, although the government's evidence on twelve of the counts was overwhelming, the government only presented single witnesses to testify on each of Counts Six, Eight, and Nine. As a result, he argues, the highly corroborated testimony on the twelve other counts influenced the jury's conclusions regarding these three counts. Olsen contends that this spillover effect was substantial and prejudiced his defense.

This argument is foreclosed by circuit precedent. We have repeatedly held that simply because "the government's evidence was stronger on some counts

than on others does not mandate severance under Rule 14." United States v. Wiseman, 172 F.3d 1196, 1212 (10th Cir. 1999) (quoting United States v. Cox, 934 F.2d 1114, 1120 (10th Cir. 1991)); see also United States v. Furman, 31 F.3d 1034, 1037 (10th Cir. 1994). For each of the three counts on which Olsen moved for severance, the government presented testimony that directly contradicted Olsen's grand jury statements and that adequately supported the jury's guilty verdict. Given this fact, we cannot agree that Olsen was unduly prejudiced simply because the government may have proffered more evidence on some counts of the indictment than others.

Olsen also claims that by denying the motion to sever the three counts, the jury heard inflammatory evidence that would have been otherwise inadmissible in a trial on the other twelve counts. We do not doubt that the evidence presented on these counts, in which several women testified that Olsen raped or beat them, would have left an impression on the jury. But we have been reluctant to find prejudice where "the relationship of the charges [grows] out of the defendant's own conduct." Valentine, 706 F.2d at 290; see also United States v. Jones, 213 F.3d 1253, 1260-61 (10th Cir. 2000). Moreover, the trial court issued a limiting instruction, specifically admonishing the jury that it was to "consider [the] evidence [of other acts] only as it is offered to show the truthfulness or falsity of the defendant's statements." Our review of the record also reveals that the trial court repeatedly reminded both counsel and the jury that Olsen's trial was one for

perjury and not assault, rape, or murder.  See <u>Valentine</u>, 706 F.2d at 290 n.7

(recognizing the important role of limiting instructions in reducing the potential

prejudice suffered by a defendant whose motion for severance has been denied).

Finally, even if the trial court had granted severance, the jury in both trials would

have heard substantial evidence involving violence against women.[6]

The district court had compelling reasons to deny severance, rooted in

judicial efficiency.  Jury selection alone took two full days of the court's time.  In

addition, those witnesses who testified to background matters such as the nature

of the grand jury investigation and the materiality of the perjured statements

would have been required to testify in two different trials.  See <u>United States v.</u>

<u>Martin</u>, 18 F.3d 1515, 1518 (10th Cir. 1994) ("In establishing real prejudice, the

defendant must demonstrate that the alleged prejudice he suffered outweighed the

expense and inconvenience of separate trials." (quotation omitted)); <u>United States</u>

<u>v. Janus Indus.</u>, 48 F.3d 1548, 1557-58 (10th Cir. 1995) (concluding that a district

court did not abuse its discretion in denying a motion to sever where the evidence

on the disputed counts would have been otherwise relevant and material to the

remaining counts).  Considering that the government's evidence on the three

counts was not aberrantly or unfairly prejudicial to Olsen, we hold that the district

---

[6] For example, Amber Payne's testimony that Olsen raped her would still
have been admissible to show perjury on Count Seven, a count which Olsen did
not move to have severed.

court did not abuse its broad discretion in refusing to grant Olsen's motion for severance.

## III

### A

With respect to his sentence, Olsen contends that the district court violated his due process rights by failing to apply a heightened evidentiary standard to its finding that U.S.S.G. § 2X3.1, the cross reference, applied in this case. According to Olsen, where the application of a particular guideline causes a large impact on the resulting advisory sentencing range, as occurred in this case, due process requires the application of a standard of proof greater than the preponderance standard generally required for factual findings supporting a sentence. He points out that his advisory range was more than six times what it would have been absent application of the cross reference. Olsen also argues that the preponderance of the evidence standard is inappropriate as applied to his case because the cross reference transformed his perjury sentence into the "functional equivalent of a murder sentence."

With regard to the essential elements of a criminal conviction, it is well-settled that the government must prove its case beyond a reasonable doubt. See, e.g., In re Winship, 397 U.S. 358, 364 (1970). In the sentencing context, by contrast, the Supreme Court has held that a preponderance of the evidence standard is generally sufficient to satisfy due process concerns. See McMillan v.

Pennsylvania, 477 U.S. 79, 91-92 (1986); see also United States v. Watts, 519

U.S. 148, 156 (1997).  We have since hewn to this standard, especially in light of

United States v. Booker, 543 U.S. 220 (2005), which relegated the Guidelines to

an "effectively advisory" status.[7]  Id. at 245.  Because "[u]nder an advisory

Guidelines regime, a conviction, by itself, authorizes a sentence up to the

statutory maximum," in ordinary cases, due process is not implicated by factual

findings that result in a sentence below that statutory maximum.[8]  United States v.

Crockett, 435 F.3d 1305, 1319 (10th Cir. 2006).

As primary support for his due process argument, Olsen points us to several

cases from the Ninth Circuit, which hold that sentencing facts must be supported

by clear and convincing evidence if they have an "extremely disproportionate

effect on the sentence relative to the offense of conviction."[9]  United States v.

_____

[7] Olsen's arguments, which invoke the Due Process Clause of the Fifth Amendment, are conceptually distinct from, but not entirely unaffected by, the Sixth Amendment holding of Booker.  In Booker, the Court held that the then-mandatory Sentencing Guidelines violated the Sixth Amendment's guarantee of a jury trial, and relegated the Guidelines to an advisory status.  543 U.S. at 244-45.

[8] Title 18 U.S.C. § 1623(a), the statute of Olsen's conviction, authorizes a maximum sentence of 75 years' imprisonment in this case, five years for each of the fifteen separate counts of conviction.

[9] The Ninth Circuit continues to apply this rule following Booker, and has required a heightened standard of proof for enhancements of lesser magnitude than that in Olsen's case.  See United States v. Staten, 466 F.3d 708, 717-20 (9th Cir. 2006) (requiring findings by clear and convincing evidence when the defendant's sentence was increased by four offense levels, resulting in a doubling of the guidelines range).  We also note that the Third Circuit previously applied

(continued...)

Peyton, 353 F.3d 1080, 1088 (9th Cir. 2005) (quotations omitted); see also Staten, 466 F.3d at 717-20.  But our circuit has never adopted the clear and convincing standard in so-called disproportionate impact cases.  While recognizing "strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof," we have long held that sentencing facts in the "ordinary case" need only be proven by a preponderance.  United States v. Washington, 11 F.3d 1510, 1516 (10th Cir. 1993); see also United States v. Frederick, 897 F.2d 490, 492 (10th Cir. 1990); Crockett, 435 F.3d at 1318-19.  Nonetheless, we have reserved the question of whether, in some extraordinary or dramatic case, due process might require a higher standard of proof.  See United States v. Espinoza, 67 Fed App'x 555, 561 (10th Cir. 2003) (unpublished) (characterizing United States v. Mendez-Zamora, 296 F.3d 1013 (10th Cir. 2002), as "apparently leaving open the possibility that a more dramatic increase in sentence might warrant a heavier burden of proof").

**B**

Olsen asks us to take the Ninth Circuit's approach, characterizing this as an "extraordinary case," one in which he was convicted of perjury but sentenced for

---

[9](...continued)
an approach similar to the Ninth Circuit's, see United States v. Kikumura, 918 F.2d 1084 (3rd Cir. 1990), but has discontinued the practice following Booker. See United States v. Fisher, 502 F.3d 293, 305-08 (3d Cir. 2007) (overruling reasoning in Kikumura following the Supreme Court's remedial decision in Booker).

murder, and as to which a higher burden of proof should apply to the Guidelines cross reference. We need not engage today in the debate surrounding the appropriate standard of proof, however. As we will explain, the cross reference only required the judge to find that the perjury interfered with a murder investigation, not that Olsen committed a murder. Because the record would have compelled the district court to make this finding under any conceivable standard of proof, any due process error here in the standard of proof is harmless.

When perjury is committed "in respect to" another crime, the perjury guideline requires sentencing under the Accessory After the Fact cross reference, which generally leads to higher offense levels. § 2J1.3(c)(1). In interpreting the phrase "in respect to," we have always afforded the text its plain meaning. We have adopted the view that the government neither must charge the defendant with the underlying offense in order for the cross reference to apply, see United States v. Renteria, 138 F.3d 1328, 1334-35 (10th Cir. 1998), nor must it demonstrate that the defendant committed the underlying crime. It need only show that the perjury was "related to the criminal offense in a 'very entwined and enmeshed way.'" Id. (quoting United States v. Martinez, 106 F.3d 620, 622 (5th Cir. 1997)); accord United States v. Arias, 253 F.3d 453, 461 (9th Cir. 2001) ("[W]e conclude that § 2J1.3(c)(1) requires cross referencing without regard to whether the underlying offense whose prosecution was obstructed was or is provable."); United States v. Suleiman, 208 F.3d 32, 38 (2d Cir. 2000) ("The

- 20 -

purpose of the 'in respect to' enhancement is to treat more severely perjuries that risk an incomplete or an inaccurate investigation or trial of a criminal offense."); United States v. Dickerson, 114 F.3d 464, 468 (4th Cir. 1997) ("If the underlying offense always constituted the offense of conviction, perjurers would be able to benefit from perjury that successfully persuaded a grand jury not to indict . . . ."); United States v. McQueen, 86 F.3d 180, 182-83 (11th Cir. 1996) ("The language of the cross-referencing provision [applies] . . . without regard to whether defendant or anybody else was convicted of the underlying offense, or whether an offense could be shown to have been committed at all.").  In other words, the text of the perjury guideline, combined with the cross reference, requires perjury which obstructs an investigation into a criminal offense to be punished more severely than other sorts of perjury; the more serious the subject matter of the affected investigation, the greater the resulting sentence.

In light of the rationale supporting application of § 2X3.1 in perjury cases, this is not a case, as Olsen suggests, in which the government obtained a murder conviction by proving mere perjury.  Rather, it is a serious case of perjury in its own right, where, at sentencing, the district court made the unremarkable factual finding that the perjury related to a grand jury investigation into the disappearance and possible death of Kiplyn Davis.[10]

---

[10] Not only does the cross reference not require proof of guilt for murder, but, as a practical matter, it does not sentence Olsen as if he had committed

(continued...)

Thus, even if our precedents do not fully foreclose the possibility that, in the drastic case of a six-fold Guidelines range increase, something more than a preponderance of the evidence is required, any constitutional error that occurred here would be harmless beyond a reasonable doubt. See United States v. Pearson, 203 F.3d 1243, 1262-63 (10th Cir. 2000). A plain application of the cross reference to the uncontroverted facts in the record compels the conclusion that Olsen's testimony before the grand jury related, beyond any reasonable doubt, to an investigation into whether a murder had occurred. The grand jury was convened after Davis had been missing for a decade. During his day of testimony before the grand jury, Olsen was questioned extensively about prior statements he had made indicating that Davis had been murdered. And during the government's lengthy presentation of evidence at trial, witness upon witness testified that Olsen had spoken of Davis as if she were deceased as the result of foul play.

Under any standard of proof—whether it be a preponderance of the evidence, clear and convincing evidence, or proof beyond a reasonable doubt—the evidence showed that Olsen perjured himself before a grand jury that was investigating Davis' disappearance and attempting to determine whether that

---

[10](...continued)
murder. In fact, Olsen's advisory sentencing range for perjury was less—by half—than his advisory sentencing range for a hypothetical conviction of second-degree murder in the federal system. See U.S.S.G. § 2A1.2 (specifying an offense level of 38 for second-degree murder); id. Ch. 5, Pt. A (establishing an advisory range of 262-327 months for an offense level of 38 and a criminal history category of II).

disappearance resulted from a murder. In other words, Olsen's perjury related to the crime of murder in a "very entwined and enmeshed way," <u>Renteria</u>, 138 F.3d at 1334 (quotation omitted), and the district court did not err in applying the cross reference. In light of this conclusion, we have no occasion today to decide whether any exceptions exist to the usual preponderance standard for the finding of sentencing facts, and we hold that the district court did not err in applying the challenged cross reference to Olsen's sentence.[11]

## IV

For the reasons set forth above, we **AFFIRM** Olsen's conviction and sentence.

---

[11] Considering the relatively large impact of the cross reference applied in this case, we emphasize that the Guidelines are indeed advisory and constitute but one of many sentencing considerations. <u>See</u> <u>Gall v. United States</u>, 128 S. Ct. 586, 596 (2007); <u>Kimbrough v. United States</u>, 128 S. Ct. 558, 570 (2007). Although the district court here found Olsen's perjury to be both severe and centrally related to important aspects of the grand jury's investigation, this may not be so in every case. If application of the cross reference should significantly increase the Guidelines range in a case where the perjury interfered only marginally with a grand jury's investigation, the district court has well-established discretion to vary from the Guidelines range and fashion a reasonable sentence "sufficient, but not greater than necessary, to comply" with the purposes of sentencing set forth in § 3553(a)(2). 18 U.S.C. § 3553(a).