FILED
United States Court of Appeals
Tenth Circuit

June 11, 2012

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

MEDARDO VALDEZ VALENZUELA,

      Defendant-Appellant.

No. 11-4127
(D.C. No. 1:09-CR-00082-DB-1)
(D. Utah)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE**, Chief Judge, **PORFILIO**, Senior Circuit Judge, and **MURPHY**, Circuit Judge.

A jury convicted appellant Medardo Valdez Valenzuela on two counts, conspiracy to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1) and 846, and possession of a controlled substance with intent to distribute in violation of 21 U.S.C. § 841(a)(1). On the first count, the jury found by special verdict that he had conspired to distribute between 350 and 500 grams of

---

[*]     After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

methamphetamine.  At sentencing, in addition to the quantity of drugs seized at Valenzuela's house, the district court attributed to Valenzuela another 900 grams of methamphetamine found in a car, which increased his base offense level under the United States Sentencing Guidelines from 30 (under the jury's findings) to 36, and increased the base sentencing range from 97-121 months to 188-235 months.[1]  The district court assessed a two-level increase against Valenzuela for being an organizer, leader, manager, or supervisor of criminal activity, resulting in a sentencing range of 235-293 months, but varied downward from that range and sentenced Valenzuela to 180 months' imprisonment.  Valenzuela appeals, contesting the sufficiency of the evidence against him and the procedural and substantive reasonableness of his sentence.  Exercising jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742, we affirm Valenzuela's convictions and sentence.

## I.      BACKGROUND

In August 2009, Valenzuela became the subject of a wiretap investigation involving a phone number linked by a global positioning system (GPS) to a cell phone in use at Valenzuela's residence in Clinton, Utah, a rental house he shared with Francisco Zetina-Arriaga (Zetina).  Federal and local law enforcement agencies initiated an investigation, which included surveillance of the house.  On one occasion in late September 2009, an officer observed two men in a Volkswagen Passat arrive

---

[1]     All references to the Guidelines are to the 2010 edition under which Valenzuela was sentenced.

at Valenzuela's house and park behind it, out of the officer's sight. The officer then observed Valenzuela arrive and also park in the back. About two hours after the men arrived in the Passat, they drove off in it. Another officer followed them to a hotel, where they spent a short time in a room and emerged with a suitcase, pillows, and a blanket. After the officers observed the driver of the Passat commit a traffic violation, the officers stopped the Passat. The men consented to a search, which uncovered two plastic bags in the trunk containing a total of 900 grams of methamphetamine. The two men, whom officers later identified as Mario Gutierrez and Juan Samano, were arrested.

On the same day, Zetina left the house in a different car. He was followed and arrested. Later that night, a search warrant was executed at Valenzuela's house.[2] Among other things, officers found three separate bags containing a total of 132 grams of a mixture of methamphetamine and dimethyl sulfone (a dietary supplement used as a cutting agent). These bags were found in the southeast bedroom of the house, referred to at trial as bedroom number one. In a bathroom, officers found 33.3 grams of dimethyl sulfone wrapped in tin foil and 399.5 grams of dimethyl sulfone in a plastic grocery bag. In another bedroom, officers found .84 grams of pure methamphetamine and 27.2 grams of a mixture of methamphetamine and dimethyl sulfone. In a third bedroom, officers found a handgun.

---

[2]    Valenzuela was not at the house when the search was conducted but was arrested sometime later.

At trial, the parties stipulated that the cell-phone number subject to the wiretap was not assigned to Valenzuela. However, Valenzuela's landlord provided testimony linking Valenzuela to the cell-phone number: Valenzuela had given him the number that was the subject of the wiretap. Valenzuela's landlord programmed the number into his phone under "Medardo," he had called Valenzuela at that number many times inquiring about the rent, he received calls from Valenzuela from that number (as shown by his caller ID), and he recognized Valenzuela's voice on the voicemail greeting for that number. The landlord further testified that he provided Valenzuela's telephone number to a federal investigator, who confirmed that it was the same number that was the subject of the wiretap.

Regarding bedroom number one, the landlord testified that Valenzuela had said it was his. In addition, in August 2009, Valenzuela informed the landlord that he and Zetina would be breaking the lease and moving out at the end of the month because they could not pay the rent. When the landlord attempted to show the house to prospective tenants, there was a lock on the door to bedroom number one that had not been there before, and Valenzuela said he would not let the landlord in because there was a stain on the carpet and the room was a mess.

The government introduced into evidence eighteen recorded wiretap conversations in Spanish, each of which was accompanied by a Spanish transcript and an English translation. Most of the recordings were played to the jury. An English translator testified as to the contents of the conversations. The translator testified that one of

the voices in every conversation belonged to the same person. In five of those conversations, a woman named Margarita called that person by Valenzuela's first name, "Medardo." In the other conversations, Valenzuela was sometimes addressed as "Lalo" but never as Medardo. Although there was little or no direct reference to drugs, sales, or money, the government presented expert testimony from a DEA agent that drug traffickers often use code words for drugs and money, and that one pound of methamphetamine (453.59 grams) sold for between $16,000 and $20,000. In this case, the government theorized, Valenzuela and his alleged co-conspirators used code words such as "paint" for methamphetamine, "thinner" for the cutting agent, and "bucket" of paint to refer to a one-pound quantity of methamphetamine. Because Valenzuela ran a legitimate painting business, the theory continued, paint-related code words would make it difficult for authorities to figure out that in fact he and his co-conspirators were talking about drugs. Other code words allegedly used included "paper" and "paperwork" for money, and "water," "the material," "food," and "car" for methamphetamine.

## II.    DISCUSSION

### A.    Sufficiency of the evidence

Valenzuela contests the sufficiency of the evidence on both counts of conviction, but he did not move for acquittal in the district court. In this circumstance, our review technically is for plain error. *See United States v. Kaufman*, 546 F.3d 1242, 1263 (10th Cir. 2008). "Plain error occurs when there is

- 5 -

(1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Gonzalez-Huerta*, 403 F.3d 727, 732 (10th Cir. 2005) (quotation omitted). However, as a practical matter, the standard actually applied is the same as if there had been a motion for acquittal—de novo—because a conviction in the absence of sufficient evidence is plainly an error affecting substantial rights provided that "the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Kaufman*, 546 F.3d at 1263; *see also United States v. Cox*, 929 F.2d 1511, 1514 (10th Cir. 1991) (noting that plain error is sometimes invoked where a judgment of acquittal is not renewed at the close of all evidence, "yet the standard actually applied is essentially the same as if there had been a timely motion for acquittal" (quotation omitted)).

"Evidence is sufficient to support a conviction if a reasonable jury could find the defendant guilty beyond a reasonable doubt, given the direct and circumstantial evidence, along with reasonable inferences therefrom, taken in a light most favorable to the government." *United States v. Nelson*, 383 F.3d 1227, 1229 (10th Cir. 2004) (quotation omitted). "A 'reasonable doubt' is a doubt based upon reason and common sense after careful and impartial consideration of all the evidence in the case." *United States v. Clifton*, 406 F.3d 1173, 1178 (10th Cir. 2005) (quotation omitted). Evidence is evaluated "by considering the collective inferences to be drawn from the evidence as a whole." *Nelson*, 383 F.3d at 1229 (quotation omitted).

"In conducting our inquiry, we do not weigh conflicting evidence nor consider the credibility of witnesses.  Instead, we must simply determine whether the evidence, if believed, would establish each element of the crime."  *United States v. Delgado-Uribe*, 363 F.3d 1077, 1081 (10th Cir. 2004) (brackets, citation, and quotation omitted).

As to the conspiracy charge, the government was required to "prove beyond a reasonable doubt:  (1) an agreement with another person to violate the law, (2) knowledge of the essential objectives of the conspiracy, (3) knowing and voluntary involvement, and (4) interdependence among the alleged conspirators."  *Id.* at 1083.  Valenzuela argues that there was no verification that the voice on the wiretap recordings was his, and that there was no discussion of drug dealings, only references to "buckets of paint" and "paper."  Further, he claims there was no testimony that he ever discussed buying or selling drugs or possessed any drugs or cash from selling large quantities of drugs.  Finally, he claims that without proof that his was the voice on the wiretap recordings or that he ever made a drug sale or buy, there was insufficient evidence of interdependence.

Having reviewed the record, we conclude that there was sufficient evidence to support the jury's verdict on the conspiracy charge.  As recounted above, the landlord's testimony supported a finding that the cell phone that was the subject of the wiretap was Valenzuela's.  Further, in one recorded call, Valenzuela told an unidentified man that his landlord wanted him out of the house because of his

inability to pay the rent. In other calls, Valenzuela referred to his painting business and to himself as a painter. And the cell phone was tracked via GPS to Valenzuela's house. All of this, combined with the references to him by name in the calls with Margarita and testimony that it was the same voice on the other intercepted calls containing the coded conversations, was sufficient for the jury to conclude that it was Valenzuela's voice on all the calls. And although Valenzuela and those he spoke with used code words, we have previously held that a jury could rely on expert testimony to determine that co-conspirators used code words when referring to drugs. *See United States v. Earls*, 42 F.3d 1321, 1324-25 (10th Cir. 1994). Here, there was expert testimony regarding the use of code words, and those coded references were more than sufficient for the jury to find that Valenzuela was discussing drug sales, particularly when viewed in connection with the evidence that drugs were found in Valenzuela's bedroom. We will not recount all of those references but instead recite several illustrative examples.

During three closely spaced conversations with a man referred to as "Chapo" (allegedly Zetina), Valenzuela said "I'll give you the price that we'll give to . . . to the . . . to that person that we sell to in bulk. And it costs him 16,800." Supp. R., Vol. 1 at 25.[3] Chapo told Valenzuela:

> And I brought him a . . . a . . . a sample to do the paint test on, and the
> guy liked it, uh, because what he uses, uh, is very . . . is . . . is more . . .

---

[3] All ellipses in quotes from the recorded conversations are part of the transcript.

is worse, and they're charging more for the . . . the bucket. And he's interested. Uh, but the problem is that here he . . . he . . . he just asked for some from the other store. So then he tells me that if . . . that if we have some right now, uh, in . . . I just now saw the paperwork, they already have it there. I don't know if you have buckets of paint available.

*Id.* at 27. Valenzuela told Chapo to tell the buyer "that we do have some" but it was "already spoken for as well. It's already ordered. By the . . . by the client. Uh, but tomorrow, most likely at night, or . . . or in the morning on the following day, uh, we'll have what . . . what he needs here." *Id.* at 29. Chapo said that the buyer could cancel his other order if Chapo "had the bucket today" and that the buyer could not leave "the stuff without . . . without paint, right?" *Id.* at 32. Chapo also pointed out that the other supplier was "charging 18,500 per bucket, and it's worse. I mean, it's bad, our . . . our . . . our paint is better." *Id.*

In another conversation, Chapo told Valenzuela, "I have, uh, the paper in my hands. Uh, I'm just driving around to lose the tail[.]" *Id.* at 23. In yet another conversation, Chapo said, "And they already have the paperwork in hand. I mean, it's . . . it's already taken . . . the deal in order to . . . in order to . . . in order to go do the . . . in order to do the job, the . . . the . . . the handy work." *Id.* at 51. Chapo added: "Because he's the first client and to let him down, well, I . . . I'd be a little bothered." *Id.* Valenzuela responded that "there isn't a problem on this side, the . . . the . . . the problem is the . . . the thinner." *Id.* at 52. He cautioned Chapo to "be very careful," and told Chapo to "come by here if you want" in order "to see how we do it here." *Id.*

Our final example comes from two other conversations with Chapo, who told Valenzuela that he had

> got[ten] a hold of this person. He does have the money, but well, it's logical, he wants to see the paint, right? So tell me, how do you want me to proceed? He has . . . the . . . the guy already has the paper, uh, but he's telling me that . . . that he wants to see the . . . the paint.

*Id.* at 58. Valenzuela told Chapo to "take it to him." *Id.* Chapo said the buyer was a "waiter here at the Red Lobster" who said he "'want[s] to see the mer . . . the . . . the paint.'" *Id.* at 59. Valenzuela told Chapo "it's just a matter of . . . of . . . of grabbing the bucket and taking it to him. That's all, nothing else has to be done to it. It's all sealed and closed[.]" *Id.* Chapo said another man named Pancho would accompany him "to make it safer." *Id.* at 60. The next day, Chapo reported that "they wanted to steal the material from us. The . . . the bucket of green paint." *Id.* at 62. He added, "We were able to save it, thank God," and that the "green paint," Chapo, and Pancho were all "OK." *Id.*

A reasonable jury could have concluded that these conversations proved Valenzuela was involved in the charged conspiracy. The repeated references to buyers interested in purchasing "paint" stored in "buckets" for amounts up to "18,500" reasonably suggest Valenzuela was employing code words for drugs when discussing potential sales with a co-conspirator. The jury's verdict was amply supported by the wiretap conversations, expert testimony on use of code words, circumstantial evidence that the voice on the call was Valenzuela's, and the testimony that the cell phone that was the subject of the wiretap was Valenzuela's. In

- 10 -

sum, having reviewed the transcripts in light of all the evidence, and drawing all reasonable inferences in favor of the government, as we must, *see Nelson*, 383 F.3d at 1229, we conclude that there was sufficient evidence to support Valenzuela's conviction on the conspiracy charge.

As to the charge of possession with intent to distribute, Valenzuela argues there was insufficient evidence of his actual or constructive possession of the drugs found in his home and insufficient evidence of intent to distribute. But as we have recounted, a substantial quantity of methamphetamine was found in bedroom one, and Valenzuela had told his landlord that bedroom number one was his. Thus, the evidence supported a finding that Valenzuela constructively possessed the drugs found in bedroom one. *See United States v. Lauder*, 409 F.3d 1254, 1259 (10th Cir. 2005) (stating that, "[i]n joint occupancy cases where possession is not clear, such as where the drugs may be attributed to more than one person," constructive possession may be shown by "some nexus, link, or other connection between the defendant and the contraband"). Further, the intercepted telephone conversations provided additional evidence of Valenzuela's intent to distribute. We conclude that there was sufficient evidence to support Valenzuela's conviction for possession with intent to distribute.

### B. Sentencing

Valenzuela also challenges the procedural and substantive reasonableness of his sentence. "Procedural reasonableness involves using the proper method to

calculate the sentence." *United States v. Conlan*, 500 F.3d 1167, 1169 (10th Cir. 2007). "Substantive reasonableness involves whether the length of the sentence is reasonable given all the circumstances of the case in light of the factors set forth in 18 U.S.C. § 3553(a)." *Id.* We consider these challenges in order.

### 1. Procedural reasonableness

Valenzuela first argues that the district court committed procedural error when it applied a preponderance-of-the-evidence standard in determining whether the 900 grams of methamphetamine found in the Passat were attributable to him. He claims that the court should have used the higher clear-and-convincing-evidence standard of proof because facts considered at sentencing dramatically increased his sentence. We rejected this argument on similar facts in *United States v. Washington*, 11 F.3d 1510 (10th Cir. 1993). In *Washington*, this court held that the preponderance standard applied to findings of drug quantity at sentencing that resulted in an eight-level increase in base offense level (from 32 to 40). *See id.* at 1515-16. We considered this increase to be an "ordinary case," and stated that "the Due Process Clause does not require sentencing facts in the ordinary case to be proved by more than a preponderance standard." *Id.* at 1516. To the extent that this court has elsewhere intimated that a higher standard might apply in the extraordinary case, *see, e.g.*, *United States v. Olsen*, 519 F.3d 1096, 1105 (10th Cir. 2008) ("[W]e have reserved the question of whether, in some extraordinary or dramatic case, due process might require a higher standard of proof."), we decline to apply it here. The six-level

- 12 -

increase in Valenzuela's case is less than the eight-level increase in *Washington*.

Valenzuela's case is, like *Washington*, not an "extraordinary or dramatic" one. *See*

*Olsen*, 519 F.3d at 1105. Accordingly, the district court did not commit procedural

error in applying the preponderance standard.[4]

Valenzuela next argues that the government failed to prove that the 900 grams

found in the Passat were attributable to him by a preponderance of the evidence.[5] A

district court's determination of drug quantity at sentencing is a factual finding

"reviewed for clear error." *United States v. Dalton*, 409 F.3d 1247, 1251 (10th Cir.

2005). At sentencing, the district court relied on the evidence at trial and "credit[ed]

to some degree" Zetina's deposition testimony, R., Vol. 2 at 518, which the court had

ruled inadmissible at trial because the government failed to show that Zetina was not

available to testify in person, *see* Fed. R. Evid. 804(a)(5) and 804(b)(1). In relevant

part, Zetina, who stated that he was Chapo, testified that the day before officers

seized the drugs from the Passat, which was registered to a known methamphetamine

and cocaine dealer, he saw three pounds of methamphetamine on the kitchen table in

---

[4] We are cognizant that Ninth Circuit law, on which Valenzuela relies, is to the contrary. *See, e.g.*, *United States v. Jordan*, 256 F.3d 922, 930 (9th Cir. 2001) (requiring clear-and-convincing standard "when a sentencing factor has an extremely disproportionate impact on the sentence relative to the offense of conviction"). We are, however, bound by our own precedent and in any event do not find *Jordan* persuasive as regards the facts of this case.

[5] Valenzuela also argues that the government did not meet its burden under the clear-and-convincing standard. Because that standard is not applicable to this case, we need not consider this argument.

the house he shared with Valenzuela.  Valenzuela and two other men (including one of the men arrested in the Passat) were dividing up the methamphetamine to sell it. Zetina also testified that the drugs were still there the next day.  The court concluded that the 900 grams found in the Passat "is probably, in my view of all of the evidence, a relatively small amount relative to what he was dealing with.  I think he was apparently dealing with multiple pound transactions."  R., Vol. 2 at 518.

Valenzuela contends that Zetina's deposition testimony was uncorroborated and insufficiently reliable to connect Valenzuela to the drugs found in the Passat. We reject this proposition.  First, corroboration is not essential in all cases.  Rather, § 6A1.3(a) of the Guidelines provides that a "court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy."  The corroboration requirement identified in *United States v. Ortiz*, 993 F.2d 204, 207-08 (10th Cir. 1993), on which Valenzuela relies, stems from the commentary to § 6A1.3 requiring corroboration for statements made by an unidentified informant.  Here, Zetina was not an unidentified informant but a potential trial witness who was deposed for the acknowledged purpose of preserving his testimony for trial, and he was subject to cross-examination.  In the other case Valenzuela cites in support of his corroboration argument, *United States v. Rosales*, 80 F. App'x 57, 60-61 (10th Cir. 2003) (unpublished), the court considered reliable a DEA agent's affidavit detailing the agent's purchase of 907 grams of

- 14 -

methamphetamine in part because the defendant corroborated the amount in a recorded conversation. However, there is no indication in *Rosales* that corroboration was required or that corroboration is required in every instance where a district court relies on unadmitted hearsay evidence at sentencing. Second, the district court relied only in part on Zetina's testimony in finding that the quantity of drugs in the Passat was attributable to Valenzuela. *See* R., Vol. 2 at 518 (crediting Zetina's unadmitted deposition testimony "to some degree"). There was other evidence linking Valenzuela to that quantity of drugs.

Valenzuela argues that the other evidence showed only that the Passat was present at Valenzuela's home on the same day it was pulled over and the drugs found. He contends there was no evidence that the Passat's occupants or anyone else entered or exited Valenzuela's home or that Valenzuela was ever in possession of any amount of drugs at the time of his arrest or otherwise. The logical conclusion, Valenzuela posits, is that the 900 grams belonged to the Passat's registered owner. But it is of little consequence that no officer saw the men who had arrived in the Passat actually enter Valenzuela's house. The Passat remained behind Valenzuela's house for two hours, Valenzuela arrived during that time, and Zetina had observed one of the Passat's occupants at the house the day before dividing up three pounds of methamphetamine to sell. The district court could reasonably infer that all three men went into the house and that, regardless of who may have owned the methamphetamine, 900 grams were transferred to the Passat as part of a conspiracy

between Valenzuela and at least one other person to distribute it. Hence, we conclude that the trial evidence, coupled with Zetina's testimony, was sufficient for the district court to find, by a preponderance of the evidence, that the drugs found in the Passat were attributable to Valenzuela.

## 2.      Substantive reasonableness

Valenzuela's final challenge concerns the substantive reasonableness of his below-Guidelines sentence. A below-Guidelines sentence is entitled to a "rebuttable presumption of reasonableness." *United States v. Balbin-Mesa*, 643 F.3d 783, 788 (10th Cir. 2011). To rebut that presumption, Valenzuela "must demonstrate that the district court abused the discretion afforded to it by Congress in sentencing under 18 U.S.C. § 3553." *United States v. McComb*, 519 F.3d 1049, 1053 (10th Cir. 2007). Under this standard, we defer to the district court's judgment provided that the sentence falls within "a range of possible outcomes the facts and law at issue can fairly support," *id.*, and we will reverse "where a decision is either based on a clearly erroneous finding of fact or an erroneous conclusion of law or manifests a clear error of judgment," *id.* at 1054 (quotation omitted).

In an effort to rebut the presumption of reasonableness, Valenzuela contends that even the statutory five-year mandatory minimum sentence (which he asked for at sentencing) and his likely deportation to Mexico (he is legally in the country but not a U.S. citizen) would have devastating consequences for his family. He also claims that attributing to him the 900 grams of methamphetamine found in the Passat

- 16 -

unreasonably increased his sentence, and that his sentence was greater than necessary given his "lack of a criminal record, his work record, the community support he received, the support he provided to his family and employees, and his general good character," Aplt. Br. at 22. But the district court considered these factors and varied downward from the bottom of the Guidelines range by fifty-five months. We cannot say that the court abused its discretion in refusing to vary further downward or that the sentence was not within the range of possible outcomes supported by the facts and the law.

## III.    CONCLUSION

We **AFFIRM** Valenzuela's convictions and sentence.

Entered for the Court


Mary Beck Briscoe
Chief Judge